IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS R. WHITTAKER, CHRISTY L. WHITTAKER, ESTATE OF DAVID C. HAMILTON, and EDNA J. HAMILTON, as Executrix of the Estate of David C. Hamilton, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 04-1092 |
| COUNTY OF LAWRENCE, TOWNSHIP OF NESHANNOCK, LAWRENCE COUNTY ECONOMIC DEVELOPMENT CORPORATION, REDEVELOPMENT AUTHORITY OF LAWRENCE COUNTY, STEVE J. CRAIG, DANIEL J. VOGLER, FRANK TELESZ, JAMES GAGLIANO, JR., DENNIS F. ALDUK, JOSEPH CAMINITI, RYAN KEGEL, JON NATALE, GALE E. MEASEL, JR., ROBERT DEL SIGNORE, SR., and LINDA NITCH, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Nora Barry Fischer |
| Defendants. | ) | |

**MEMORANDUM OPINION**

I.    **Introduction**

        This action concerns an exercise of eminent domain power alleged to have been in violation

of both the United States Constitution and the Pennsylvania Constitution.  Currently pending before

the Court is a motion to dismiss filed by the Defendants pursuant to Federal Rule of Civil Procedure

12(b)(6).  (Docket No. 161).  For the reasons that follow, that motion will be granted with respect

to all federal constitutional claims contained in the second amended complaint.  The Court will

1

decline to exercise supplemental jurisdiction over the Plaintiffs' state constitutional claims.

## II.      Factual Background and Procedural History

Since this matter comes before the Court on a motion to dismiss, the allegations contained in the second amended complaint are assumed to be true.  *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993).  Plaintiffs Thomas R. Whittaker and Christy L. Whittaker ("the Whittakers"), are adult individuals who maintain their residence on Kings Chapel Road, which is located in Neshannock Township ("Neshannock"), Pennsylvania.  (Docket No. 126, ¶ 1).  Plaintiff David C. Hamilton ("Hamilton") was the owner of real property located at RD #3, Box 599, in New Castle, Pennsylvania.  (*Id.*, ¶ 2).  He is now deceased, and the property at issue is a part of his estate.  (*Id.*).  The estate is being administered by Edna J. Hamilton ("Edna").  (*Id.*).

The County of Lawrence ("Lawrence County") is a political subdivision classified as a fifth-class county under Pennsylvania law.  (*Id.*, ¶ 3).  Neshannock is a second-class township located in Lawrence County.  (*Id.*, ¶ 4).  The Lawrence County Economic Development Corporation ("LCEDC") is a nonprofit corporation which maintains its mailing address in New Castle.  (*Id.*, ¶ 5).  The Redevelopment Authority of Lawrence County ("RALC") is a redevelopment authority organized pursuant to Pennsylvania's Urban Redevelopment Law ("URL") [35 Pa. Stat. § 1701 *et seq.*].  At all times relevant to this case, Steve J. Craig ("Craig") and Daniel J. Vogler ("Vogler") were Lawrence County Commissioners.  (*Id.*, ¶¶ 7-8).  Frank Telesz ("Telesz") was the Chairman of the Lawrence County Planning Commission ("Planning Commission").  (*Id.*, ¶ 9).  James Gagliano, Jr. ("Gagliano") was the Director of the Lawrence County Department of Planning and the Executive Director of the RALC.  (*Id.*, ¶ 10).  Dennis F. Alduk ("Alduk") was a member of the

RALC.  (*Id.*, ¶ 11).  Joseph Caminiti ("Caminiti") was both a member of the RALC and the President

of its Board of Directors ("Board").  (*Id.*, ¶ 12).  W. Ryan Kegel ("Kegel") and Jon Natale ("Natale")

were members of the RALC's Board.  (*Id.*, ¶¶ 13-14).  Gale E. Measel, Jr. ("Measel") served on

Neshannock's Board of Supervisors.  (*Id.*, ¶ 15).  Robert Del Signore, Jr. ("Del Signore") was a

Director and President of the LCEDC.  (*Id.*, ¶ 16).  Linda Nitch ("Nitch") was both a member of the

Planning Commission and the Executive Director of the LCEDC.  (*Id.*, ¶ 17).  Each of these

individuals was involved in the proposed development of 500 acres of property into an industrial

park that was to be known as "Millennium Park."  (*Id.*, ¶ 18).

The parcels of property owned by Hamilton and the Whittakers were located within the

proposed development.  (*Id.*, ¶ 29).  Hamilton's property consisted of approximately 2.5 acres of

land, while the property owned by the Whittakers consisted of roughly 84 acres of land.  *In Re:*

*Condemnation by the RALC*, 962 A.2d 1257, 1258 (Pa.Commw.Ct. 2008).  On September 18, 2002,

members of the LCEDC displayed the site to individuals who had been sent by the Ch2M Hill

Industrial Design Corporation ("IDC").  (Docket No. 126, ¶ 28).  Less than a month later, Lawrence

County officials pledged in a letter to the IDC to do their "utmost to facilitate" the Millennium Park

project.  (*Id.*, ¶ 38).  Gagliano, Measel and Nitch appeared before the Lawrence County

Commissioners on November 19, 2002, in order to request the creation of the RALC.  (*Id.*, ¶ 40).

The RALC's purpose was to assist the LCEDC in achieving its economic development goals.  (*Id.*,

¶ 40).  Nitch advised the Commissioners that she needed the RALC as a "tool in her toolbelt."  (*Id.*,

¶ 41).

By 2003, the LCEDC was actively marketing the "Millennium Park site" even though it had

not acquired the parcels of property owned by Hamilton and the Whittakers.  (*Id.*, ¶ 29).  Potential

buyers sometimes trespassed on the property without the consent of the owners. (*Id.*, ¶ 32). Because the Plaintiffs were unwilling to sell their parcels of property to the LCEDC, the Defendants allegedly devised a scheme to have the RALC created in order to facilitate the condemnation of the parcels and their eventual transfer to the LCEDC. (*Id.*, ¶¶ 35-36).

Lawrence County created the RALC on February 4, 2003. (*Id.*, ¶ 43). This action was allegedly taken for the sole purpose of condemning the Plaintiffs' parcels of property on the pretextual ground that they were "blighted." (*Id.*). One week later, state officials met with Nitch, Measel, and other LCEDC and Neshannock officials to discuss funding for the Millennium Park project. (*Id.*, ¶ 44). On February 19, 2003, the LCEDC formally adopted Resolution R2003-6, which explicitly targeted the Plaintiffs' property for acquisition. (*Id.*, ¶ 45). An agreement entered into on April 22, 2003, between Lawrence County and the LCEDC indicated that, if necessary, eminent domain powers would be invoked in order to facilitate the Millennium Park project. (*Id.*, ¶ 46). On May 21, 2003, Neshannock and the LCEDC entered into a cooperation agreement designed to further the project. (*Id.*, ¶ 47). This agreement, which was signed by Vogler and Measel on behalf of Neshannock, provided funding for the proposed development. (*Id.*). That same day, Neshannock passed Resolution 2003-61, which designated the parcels of property owned by the Plaintiffs as tax-exempt on the ground that they were "experiencing distress characterized by high unemployment, low investment of new capital, blighted conditions, and underutilized obsolete or abandoned industrial, commercial, and residential structures, and deteriorated tax base." (*Id.*, ¶ 51). Lawrence County adopted a similar "tax-exempt" resolution concerning the Plaintiffs' property on May 27, 2003. (*Id.*, ¶ 52).

On June 11, 2003, the LCEDC convened a meeting to discuss the impending condemnation

4

proceedings.  (*Id.*, ¶ 54).  Gagliano, Measel, Del Signore and Nitch were all present at the meeting. (*Id.*).  It was determined that the LCEDC would make final offers for the purchase of the Plaintiffs' property with the admonition that the Plaintiffs' refusal to sell would result in the initiation of eminent domain proceedings.  (*Id.*).  In June 2003, the LCEDC offered to pay the Whittakers $13,124.30 for each acre of their property, for a total of over $1,000,000.00.  (*Id.*, ¶ 74).  The Whittakers did not accept the offer.  (*Id.*).  A similar offer was made to Hamilton, who likewise declined to sell his property.  (*Id.*, ¶ 75).

On June 18, 2003, the IDC agreed to provide engineering services to the LCEDC in order to facilitate the development of the Millennium Park site.  (*Id.*, ¶ 55).  At an LCEDC meeting conducted on July 16, 2003, Gagliano stated that the Lawrence County Commissioners had approved the RALC's efforts to provide assistance to the LCEDC by acquiring the Plaintiffs' property, that the RALC had no intentions of retaining ownership of the property, and that the RALC would ultimately sell the property to the LCEDC. (*Id.*, ¶ 57).  Craig publicly acknowledged that discussions were underway between Lawrence County and the LCEDC concerning the acquisition of the Plaintiffs' property and the subsequent development of an industrial park.  (*Id.*, ¶ 59).  Before the end of July 2003, the Planning Commission informed George Haberman ("Haberman"), an IDC official, that the establishment of the RALC had been necessary in order to condemn certain parcels of property located within the Millennium Park site.  (*Id.*, ¶ 58).  The IDC was advised that the LCEDC's agreements with contractors would be revised to indicate that such contractors were agents of both the LCEDC and the RALC.  (*Id.*, ¶ 60).  On July 22, 2003, Nitch informed Gagliano that the IDC needed to begin its work as soon as possible in order to meet the LCEDC's deadline for completing the redevelopment of the site.  (*Id.*, ¶ 61).

The RALC held its first corporate meeting on July 23, 2003.  (*Id.*, ¶ 62).  On that occasion, a resolution was passed indicating that the RALC was going to prepare a redevelopment plan for a site in Neshannock in order to facilitate the construction of Millennium Park.  (*Id.*).  Nitch spoke in favor of the plan.  (*Id.*).  Caminiti, Natale, Alduk and Telesz all voted in favor of the resolution.  (*Id.*).  By August 1, 2003, the IDC had completed property descriptions of the parcels of property owned by the Plaintiffs with the understanding that they would be included within the redevelopment plan.  (*Id.*, ¶ 64).

On August 14, 2003, the Planning Commission passed Resolution R-2003-02, which certified that the Millennium Park site was a "blighted redevelopment area."  (Docket No. 126, ¶¶ 66, 96).  No blighted property review committee ("BPRC") was created.  (*Id.*, ¶ 86).  The Plaintiffs were not served with advance notice of the Planning Commission's meeting.  (*Id.*, ¶ 97).

On September 11, 2003, the Planning Commission passed Resolution R-2003-03, which adopted the proposed redevelopment plan based on the earlier finding of "blight."  (*Id.*, ¶ 98).  The Plaintiffs were never served with notice of the Planning Commission's meeting.  (*Id.*, ¶ 99).  The RALC passed Resolution R-2003-7 on September 17, 2003, thereby accepting the redevelopment plan and recommending that it be approved by the Lawrence County Commissioners.  (*Id.*, ¶ 100).  All RALC Board members voted in favor of the resolution.  (*Id.*).  No notice of this action was provided to the Plaintiffs.  (*Id.*, ¶ 101).

The RALC and the LCEDC entered into an agreement on February 25, 2004.  (*Id.*, ¶ 116).  The RALC agreed to condemn the Plaintiffs' property, and the LCEDC agreed to finance the condemnation.  (*Id.*).  Gagliano, Alduk, Caminiti, Kegel, Natale and Nitch all voted in favor of the

agreement.  (*Id.*).  The agreement expressly provided that the RALC was not permitted to commence eminent domain proceedings against the Plaintiffs' property before receiving a specific request to do so from the LCEDC.  (*Id.*, ¶ 117).  The LCEDC's written consent was required before the RALC could settle an eminent domain proceeding.  (*Id.*, ¶ 118).

The Planning Commission approved an amended redevelopment plan on April 13, 2004, by passing Resolution R-2004-01.  (*Id.*, ¶ 102).  The plan was certified to the Lawrence County Commissioners.  (*Id.*).  The Plaintiffs were never served with notice of the meeting.  (*Id.*, ¶ 103).  At a meeting conducted on April 28, 2004, the RALC Board unanimously approved the amended redevelopment plan by passing Resolutions R-2004-2 and R-2004-3.  (*Id.*, ¶ 104).  No notice of this meeting was served on the Plaintiffs.  (*Id.*, ¶ 105).  Thus, they were unaware of the actions taken against their property.  (*Id.*, ¶¶ 97, 99, 101, 105).

The Lawrence County Commissioners convened a hearing on May 11, 2004, in order to hear public testimony pertaining to the amended redevelopment plan.  (*Id.*, ¶ 106).  The Plaintiffs were provided with notice of the hearing.  (*Id.*).  At the hearing, Gagliano acknowledged that the parcels of property owned by Hamilton and the Whittakers did not meet the criteria for "blight" enumerated in 35 PA. STAT. § 1712.1(c), and that the same was true of the other structures located within the Millennium Park site.  (*Id.*, ¶¶ 107-109).  Measel, who testified in favor of the redevelopment plan, refused to answer questions posed to him by the Plaintiffs' attorney.  (*Id.*, ¶¶ 112-114).  After the hearing, the Lawrence County Commissioners convened a public meeting and approved the redevelopment plan.  (*Id.*, ¶ 110).  Craig and Vogler both voted in favor of the plan.  (*Id.*, ¶¶ 110-111).

Because of the impending condemnation of their property, the Whittakers commenced the

instant action on July 23, 2004, naming Lawrence County, Neshannock, the LCEDC and the RALC as defendants.  (Docket No. 1).  They requested injunctive, declaratory and monetary relief for alleged violations of both the United States and Pennsylvania Constitutions.  (*Id.*).  Hamilton filed a similar action on July 27, 2004, naming the same four defendants and seeking the same forms of relief.  (CV-04-1110, Docket No. 1).  On July 29, 2004, the RALC filed separate declarations of taking in the Court of Common Pleas of Lawrence County, Pennsylvania, thereby condemning the parcels of property owned by Hamilton and the Whittakers.  (Docket No. 126, ¶¶ 129-130).  The Plaintiffs filed preliminary objections to the declarations of taking on August 31, 2004.  (Docket No. 40, p. 2, ¶ 4).  The RALC amended its declarations of taking on September 23, 2004, and the Plaintiffs responded by filing preliminary objections to the amended filings on October 26, 2004. (*Id.*, ¶¶ 3-4).  On December 9, 2004, Hamilton's action was consolidated with the instant action. (Docket No. 25).  The proceedings in this case were stayed because of the ongoing proceedings in the Pennsylvania courts, and because the United States Supreme Court had not yet issued its decision in *Kelo v. City of New London*, 545 U.S. 469 (2005).  (Docket No. 26).

Hamilton died on January 26, 2005.  (CV-04-1110, Docket No. 23, p. 2, ¶ 5).  On June 10, 2005, the Whittakers commenced an action in this Court against Craig, Vogler, Telesz, Gagliano, Alduk, Caminiti, Kegel, Natale, Measel, Del Signore and Nitch, alleging violations of the United States and Pennsylvania Constitutions.  (CV-05-801, Docket No. 1).  Janet A. Verone ("Verone") and Earl Cunningham ("Cunningham"), both of whom had served on the Planning Commission, were also named as defendants in that action.[1]  (*Id.*, p. 2, ¶¶ 4-5).  The Whittakers' action against the

---

[1] Cunningham died on November 23, 2003.  (Docket No. 113).  Verone was not named as a defendant when the second amended complaint was filed.  (Docket No. 126).

individual defendants was consolidated with the instant action on August 18, 2005.  (CV-05-801, Docket No. 12).  Edna was substituted for Hamilton as a plaintiff in this action on August 19, 2005. (CV-04-1110, Docket No. 24).

Under Pennsylvania law, redevelopment authorities are required to file annual reports with the Pennsylvania Department of Community Affairs ("DCA").  35 PA. STAT. § 1719.  The RALC's reports for the years 2003, 2004, 2005 and 2006 indicated that it was an "inactive" entity that was not engaging in financial activity.  (Docket No. 126, ¶ 67).  During this period of time, the RALC reported that it had no assets and no liabilities.  (*Id.*).  The Lawrence County Commissioners never authorized funding for the RALC.  (*Id.*, ¶ 77).  The RALC never had employees.  (*Id.*, ¶ 78).  The Plaintiffs allege that the RALC was created solely to facilitate the condemnation and taking of their property.  (*Id.*, ¶ 79).

On June 15, 2007, Judge Thomas M. Piccione ("Judge Piccione") partially sustained and partially overruled the preliminary objections which had been filed by the Plaintiffs.  (Docket No. 50-3).  The objections to the legality of the takings were overruled, while the objections based on the alleged inadequacy of the bonds posted with the declarations of taking were sustained.  (*Id.*).  The parties cross-appealed to the Pennsylvania Commonwealth Court.  The stay in the instant case was lifted on October 15, 2007.  (Docket Nos. 67 & 68).  On January 24, 2008, in response to various motions filed by the Defendants, the Court ordered the Plaintiffs to file a single, unified complaint in accordance with the requirements which had been enunciated in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007).  (Docket No. 122).  The Plaintiffs' second amended complaint, which is presently before the Court, was filed on April 21, 2008.  (Docket No. 126).

On June 20, 2008, the Defendants filed a motion to dismiss the second amended complaint.

(Docket No. 129).   Meanwhile, the proceedings in the Pennsylvania courts continued.   The Commonwealth Court reversed Judge Piccione's decision concerning the legality of the takings on December 22, 2008, holding that the Millennium Park site was not "blighted" within the meaning of the URL and, hence, not subject to condemnation thereunder.   *In Re: Condemnation by the RALC*, 962 A.2d 1257 (Pa.Commw.Ct. 2008).   The Defendants filed a petition for allowance of appeal with the Pennsylvania Supreme Court.   On March 25, 2009, this Court denied the Defendants' motion to dismiss without prejudice.   (Docket No. 149).   The instant action was stayed until the conclusion of the proceedings in the Pennsylvania courts.   (*Id.*).

The Pennsylvania Supreme Court denied the Defendants' petition for allowance of appeal on June 23, 2009.   *In Re: Condemnation by the RALC*, 973 A.2d 1008 (Pa. 2009).   Two days later, this Court lifted the stay applicable to the instant case.   (Doc. No. 153).   On October 20, 2009, the Defendants filed a renewed motion to dismiss the second amended complaint.   (Docket No. 161).   That motion is the subject of this memorandum opinion.

## III.   Standard of Review

A valid complaint requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)(citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2008)); *see also Fowler v. UPMC Shadyside*, Civ. A. No. 07-4285, -- F.3d --, 2009 U.S. App. LEXIS 18626, at *14-15 (3d Cir. Aug. 18, 2009).

The Supreme Court in *Iqbal* clarified that the decision in *Twombly* "expounded the pleading

standard for 'all civil actions.'" *Iqbal*, 129 S.Ct. at 1953; *Fowler*, 2009 U.S. App. LEXIS 18626, at *15. The court further explained that although a court must accept as true all of the factual allegations contained in a complaint, that requirement does not apply to legal conclusions; therefore, the pleadings must include factual allegations to support the legal claims asserted. *Iqbal*, 129 S.Ct. at 1949, 1953. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 555); *see also Fowler*, 2009 U.S. App. LEXIS 18626, at *15-16; and *Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008). The determination of whether a complaint contains a plausible claim for relief under the facts asserted  "is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at 1950 (citing *Twombly*, 550 U.S. at 556); *Fowler*, 2009 U.S. App. LEXIS 18626, at *18.  In light of *Iqbal*, the United States Court of Appeals for the Third Circuit has instructed that district courts should first separate the factual and legal elements of a claim and then, accepting the "well-pleaded facts as true," "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 2009 U.S. App. LEXIS 18626, at  *5. Ultimately, to survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 556)

In evaluating a Rule 12(b)(6) motion, a court "may look beyond the complaint to matters of public record, including court files and records ... and documents referenced in the complaint or essential to a plaintiff's claim which are attached to either the [c]omplaint or the defendant's motion." *Spence v. Brownsville Area Sch. Dist.*, Civ. A. No. 08-0626, 2008 U.S. Dist. LEXIS 55026,

at *7 (W.D. Pa. July 15, 2008)(citing *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). A court may consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp.*, 998 F.2d at 1196 (citations omitted). Otherwise, a plaintiff with a legally insufficient claim could survive a motion to dismiss "simply by failing to attach a dispositive document on which it relied." *Id.*

## IV.   Discussion

The second amended complaint contains nine counts.  (Docket No. 126, ¶¶ 147-205).  In Count I, the Plaintiffs allege that the actions taken by the Defendants against their parcels of property constituted violations of the Takings Clause of the Fifth Amendment, which is applicable to the States by virtue of the Due Process Clause of the Fourteenth Amendment.  (*Id.*, ¶¶ 147-154).  Counts II, III and IV are all based on alleged violations of the Fourteenth Amendment.  (*Id.*, ¶¶ 155-178).  In Count II, the Plaintiffs assert claims under the Equal Protection Clause.  (*Id.*, ¶¶ 155-164).  Counts III and IV, which are based on the Due Process Clause, allege "procedural" and "substantive" due process violations, respectively.  (*Id.*, ¶¶ 165-178).  These federal constitutional claims, of course, are cognizable under 42 U.S.C. § 1983.  In Count V, the Plaintiffs advance a federal "civil conspiracy" claim under § 1983.  (*Id.*, ¶¶ 179-184).  Counts VI, VII, VIII and IX[2] are based on alleged violations of the Pennsylvania Constitution which parallel the federal constitutional violations alleged in Counts I, II, III and IV.  (*Id.*, ¶¶ 185-205).  The Court has jurisdiction over the Plaintiffs' federal constitutional claims pursuant to 28 U.S.C. § 1331.  Supplemental jurisdiction

---

[2]Count IX of the second amended complaint is misnumbered as a second Count VIII.  (Docket No. 126, p. 30).  The Court will refer to it as "Count IX" because it is the ninth count contained in the second amended complaint.

over the Plaintiffs' state constitutional claims is predicated on 28 U.S.C. § 1367(a).  Venue is proper

under 28 U.S.C. § 1391(b).

The Plaintiffs' federal constitutional claims are brought pursuant to § 1983, which provides:

Every person who, under color of any statute, ordinance, regulation, custom, or
usage, of any State or Territory or the District of Columbia, subjects, or causes to be
subjected, any citizen of the United States or other person within the jurisdiction
thereof to the deprivation of any rights, privileges, or immunities secured by the
Constitution and laws, shall be liable to the party injured in an action at law, suit in
equity, or other proper proceeding for redress, except that in any action brought
against a judicial officer for an act or omission taken in such officer's judicial
capacity, injunctive relief shall not be granted unless a declaratory decree was
violated or declaratory relief was unavailable.  For purposes of this section, any Act
of Congress applicable exclusively to the District of Columbia shall be considered
to be a statute of the District of Columbia.

42 U.S.C. § 1983.  This statute does not create substantive rights.  *Maher v. Gagne*, 448 U.S. 122,

129, n. 11 (1980).  A plaintiff cannot prevail in an action brought under § 1983 without establishing

an underlying violation of a federally protected right.  *Collins v. City of Harker Heights*, 503 U.S.

115, 119 (1992).  "Section 1983 itself contains no state-of-mind requirement independent of that

necessary to state a violation of the underlying federal right."  *Board of County Commissioners v.

Brown*, 520 U.S. 397, 405 (1997)(internal quotation marks omitted).

The first step for a Court to take in evaluating a claim brought under § 1983 is to "identify

the exact contours of the underlying right said to have been violated."  *County of Sacramento v.

Lewis*, 523 U.S. 833, 841, n. 5 (1998).  The federal rights invoked by the Plaintiffs in this case are

based on § 1 of the Fourteenth Amendment, which provides:

All persons born or naturalized in the United States and subject to the jurisdiction
thereof, are citizens of the United States and of the State wherein they reside.  No
State shall make or enforce any law which shall abridge the privileges or immunities
of citizens of the United States; nor shall any State deprive any person of life, liberty,

13

> or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST., AMEND. XIV, § 1.  The Due Process Clause incorporates the Fifth Amendment's Takings Clause, making it binding on the States.  *Palazzolo v. Rhode Island*, 533 U.S. 606, 611 (2001).  Therefore, the Takings Clause claims brought by the Plaintiffs, like the claims based squarely on the Due Process and Equal Protection Clauses, are grounded in the Fourteenth Amendment.

### A.    The Takings Clause Claims

The Takings Clause provides that "private property" shall not "be taken for public use without just compensation." U.S. CONST., AMEND. V.  While this constitutional provision confirms the government's authority to confiscate private property, it imposes two conditions on the exercise of that authority.  *Brown v. Legal Foundation of Washington*, 538 U.S. 216, 231-232 (2003).  First, private property may be lawfully "taken" only for a "public use." *Id.*  Second, the taking of private property by the government necessitates the payment of "just compensation" to the owner.  *First Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 314 (1987).  The "public use" condition "has long been understood to guarantee that 'one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid.'" *Goldstein v. Pataki*, 516 F.3d 50, 57 (2d Cir. 2008), quoting *Thompson v. Consolidated Gas Utilities Corp.*, 300 U.S. 55, 80 (1937).  The purpose of the "just compensation" condition is to prohibit the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 336 (2002), quoting

*Armstrong v. United States*, 364 U.S. 40, 49 (1960).

The instant case concerns only the Takings Clause's "public use" requirement.  The Plaintiffs allege that their parcels of property were condemned solely to facilitate "the development of a high technology business park known as 'Millennium Park.'" (Docket No. 126, ¶ 150).  They aver that this stated purpose for the condemnations did not constitute a constitutionally permissible "public use."  (*Id.*, ¶ 151).  The Defendants argue that the development of the Millennium Park site was a sufficiently "public" objective to satisfy the demands of the Public Use Clause.  (Docket No. 162, pp. 11-17).  In order to place the arguments raised by the parties in their proper context, a brief review of some basic constitutional principles is in order.

Congress possesses only those legislative powers which are either expressed or implied in the United States Constitution.  *McCulloch v. Maryland*, 17 U.S. 316, 411-436 (1819).  It does not have a general "police power."  *United States v. Morrison*, 529 U.S. 598, 615-619 (2000).  In contrast, every State has a "police power," which is generally defined as "the authority to provide for the public health, safety, and morals" of the State's inhabitants.  *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991)(plurality opinion).  This authority is very broad.  In *Kovacs v. Cooper*, 336 U.S. 77 (1949), the Supreme Court explained:

> The police power of a state extends beyond health, morals and safety, and comprehends the duty, within constitutional limitations, to protect the well-being and tranquility of a community.  A state or city may prohibit acts or things reasonably thought to bring evil or harm to its people.

*Kovacs*, 336 U.S. at 83 (footnote omitted).  Assuming that no fundamental rights are implicated, a state legislative enactment constitutes a valid exercise of the police power, and conforms to the Due Process Clause's rudimentary protection against irrational restraints on liberty, if it is rationally

related to a legitimate governmental interest.  *Washington v. Glucksberg*, 521 U.S. 702, 722 (1997).

While Congress has no nationwide police power, it does possess a general police power over the District of Columbia.  U.S. CONST., ART. I, § 8; *District of Columbia v. John R. Thompson Co., Inc.*, 346 U.S. 100, 108 (1953).  In *Berman v. Parker*, 348 U.S. 26 (1954), a Takings Clause case involving a challenge to a federal statute providing for the condemnation of blighted areas located within the District, the Supreme Court made it clear that the scope of the words "public use" contained in the Fifth Amendment were as broad as the scope of a sovereign's police power. Speaking through Justice Douglas, the Supreme Court declared:

> The power of Congress over the District of Columbia includes all the legislative powers which a state may exercise over its affairs.  We deal, in other words, with what traditionally has been known as the police power.  An attempt to define its reach or trace its outer limits is fruitless, for each case must turn on its own facts. The definition is essentially the product of legislative determinations addressed to the purposes of government, purposes neither abstractly nor historically capable of complete definition.  Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive.  In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it be Congress legislating concerning the District of Columbia or the States legislating concerning local affairs. This principle admits of no exception merely because the power of eminent domain is involved.  The role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one.

*Berman*, 348 U.S. at 31-32 (internal citations omitted).  By employing the term "public *purpose*," the Supreme Court rejected the notion that the words "public *use*" somehow required that property "taken" by the government be made directly accessible to the public.  The Supreme Court further stated that "public ownership" was not "the sole method of promoting the public purposes of community redevelopment projects," thereby making it clear that property acquired by means of

eminent domain could sometimes be devoted to private development.  *Id.* at 34.

In *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 231-232 (1984), the Supreme Court held that the Public Use Clause did not prevent the State of Hawaii from taking title to real property owned by lessors (for just compensation) and transferring it to lessees for the purpose of reducing the concentration of land ownership in the State.  Speaking through Justice O'Connor, the Supreme Court explained that the Fifth Amendment's "public use" requirement was "coterminous with the scope of a sovereign's police powers."  *Midkiff*, 467 U.S. at 240.  It was noted that the Supreme Court had never found a "compensated taking" to be in violation of the Fifth Amendment "where the exercise of the eminent domain power [was] rationally related to a conceivable public purpose."  *Id.* at 241.  The Supreme Court further stated:

> There mere fact that property taken outright by eminent domain is transferred in the first instance to private beneficiaries does not condemn that taking as having only a private purpose.  The Court long ago rejected any literal requirement that condemned property be put into use for the general public.
>
> ***
>
> The Act advances its purposes without the State's taking actual possession of the land.  In such cases, government does not itself have to use property to legitimate the taking; it is only the taking's purpose, and not its mechanics, that must pass scrutiny under the Public Use Clause.

*Id.* at 243-244.  Thus, *Midkiff* further solidified the principle that the term "public use" was broad enough to encompass any "public purpose" that could be lawfully pursued in conformity with the police power.

The breadth of governmental discretion is this area was subsequently articulated in a decision involving a less tangible form of property.  Under federal law, a person may not distribute or sell a pesticide that has not been registered in accordance with the Federal Insecticide, Fungicide, and

Rodenticide Act ("FIFRA") [7 U.S.C. § 136 *et seq.*].  7 U.S.C. § 136a(a).  The FIFRA establishes

a procedure that can be invoked by an applicant seeking to register a pesticide.  7 U.S.C. § 136a(c).

An applicant can submit data in support of his or her application for registration.  7 U.S.C. §

136a(C)(1)(F).  In evaluating the merits of an application, the Environmental Protection Agency

("EPA") can sometimes consider data which has already been submitted by another applicant in

support of a previous application, but only if the subsequent applicant has made an offer to

compensate the earlier applicant for the use of his or her data.  7 U.S.C. § 136a(c)(1)(F)(iii).  In

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), the Supreme Court rejected a Public Use Clause

challenge to the relevant provisions of the FIFRA by making the following observations:

> The District Court found that EPA's action pursuant to the data-consideration provisions of FIFRA would effect a taking for a private use, rather than a public use, because such action benefits subsequent applicants by forcing original submitters to share their data with later applicants.  It is true that the most direct beneficiaries of EPA actions under the data-consideration provisions of FIFRA will be the later applicants who will support their applications by citation to data submitted by Monsanto or some other original submitter.  Because of the data-consideration provisions, later applicants will not have to replicate the sometimes intensive and complex research necessary to produce the requisite data.  This Court, however, has rejected the notion that a use is a public use only if the property taken is put to use for the general public.
>
> ***
>
> Here, the public purpose behind the data-consideration provisions is clear from the legislative history.  Congress believed that the provisions would eliminate costly duplication of research and streamline the registration process, making new end-use products available to consumers more quickly.  Allowing applicants for registration, upon payment of compensation, to use data already accumulated by others, rather than forcing them to go through the time-consuming process of repeating the research, would eliminate a significant barrier to entry into the pesticide market, thereby allowing greater competition among producers of end-use products.

*Ruckelshaus*, 467 U.S. at 1014-1015 (internal citations omitted).  Because the promotion of

competition in the pesticide market was deemed to be a public purpose, the Supreme Court held that the challenged provisions of the FIFRA were in conformity with the Public Use Clause. *Id.* at 1016. In a footnote, the Supreme Court observed that the proper inquiry was not whether the relevant statutory provisions would actually accomplish Congress' stated objective of enhancing competition, but rather whether Congress could have rationally believed that the provisions would secure that objective. *Id.* at 1015, n. 18.

In *National Railroad Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 422-423 (1992), the Supreme Court upheld a federal statute permitting the Interstate Commerce Commission ("ICC") to order a private corporation to convey a stretch of railroad tracks to a separate, legislatively-created private corporation, for just compensation, in order to ensure the proper maintenance of the tracks. Speaking through Justice Kennedy, the Supreme Court explained that it would not invalidate a condemnation on Public Use Clause grounds under circumstances in which the condemnation was "*rationally* related to a *conceivable* public purpose." *National Railroad Passenger Corp.*, 503 U.S. at 422 (emphasis added), quoting *Midkiff*, 467 U.S. at 241. No factual determination was necessary as to whether the condemnation at issue would *actually* result in better track maintenance, since the dispositive question centered only on whether the ICC's decision had been *rational*. *National Railroad Passenger Corp.*, 503 U.S. at 422-423.

The broad scope of the term "public use" was further illustrated in *Kelo v. City of New London*, 545 U.S. 469 (2005), in which the Supreme Court held that a government could "take" private property, and pay just compensation to the owner, in order to facilitate private development that was believed to be economically advantageous to the area. It was undisputed that the property at issue was not blighted, and that it was subject to condemnation only because of its location within

19

the area which had been designated for the proposed development.  *Kelo*, 545 U.S. at 475.  A

Connecticut statute authorizing the use of eminent domain proceedings in order to promote economic

development was on the books.  *Id.* at 483-484.  Describing the promotion of economic development

as "a traditional and long accepted function of government," the Supreme Court declared that there

was "no basis for exempting economic development" from its "traditionally broad understanding"

of the words "public use."  *Id.* at 484-485.  Concluding its analysis, the Supreme Court explained:

> In affirming the City's authority to take petitioners' properties, we do not minimize
> the hardship that condemnations may entail, notwithstanding the payment of just
> compensation.  We emphasize that nothing in our opinion precludes any State from
> placing further restrictions on its exercise of the takings power.  Indeed, many States
> already impose "public use" requirements that are stricter than the federal baseline.
> Some of these requirements have been established as a matter of state constitutional
> law, while others are expressed in state eminent domain statutes that carefully limit
> the grounds upon which takings may be exercised.  As the submissions of the parties
> and their *amici* make clear, the necessity and wisdom of using eminent domain to
> promote economic development are certainly matters of legitimate public debate.
> This Court's authority, however, extends only to determining whether the City's
> proposed condemnations are for a "public use" within the meaning of the Fifth
> Amendment to the Federal Constitution.  Because over a century of our case law
> interpreting that provision dictates an affirmative answer to that question, we may not
> grant petitioners the relief that they seek.

*Id.* at 489-490 (footnotes omitted).  *Kelo* was a 5-4 decision.  The majority opinion was authored by

Justice Stevens.  Justice Kennedy, who voted with the majority, warned in a concurring opinion that

"[a] court applying rational-basis review under the Public Use Clause should strike down a taking

that, by a clear showing, is intended to favor a particular private party, with only incidental or

pretextual public benefits, just as a court applying rational-basis review under the Equal Protection

Clause must strike down a government classification that is clearly intended to injure a particular

class of private parties, with only incidental or pretextual public justifications."  *Id.* at 491 (Kennedy,

J., concurring).

In *Carole Media LLC v. New Jersey Transit Corp.*, 550 F.3d 302 (3d Cir. 2008), the United

States Court of Appeals for the Third Circuit summarized the Supreme Court's Public Use Clause

jurisprudence by stating as follows:

> Examples from the Supreme Court's cases demonstrate the breadth of permissible
> public purposes under the Public Use Clause.  The Court has indicated that economic
> revitalization constitutes a public purpose for a taking, even if the revitalization
> program involves transfers of property to private parties.  *Kelo*, 545 U.S. at 489-90;
> *Berman*, 348 U.S. at 33-34.  Similarly, the state and federal governments may validly
> transfer property from one private party to another in order to correct market failures.
> *Midkiff*, 467 U.S. at 243; *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1014-15, 104
> S.Ct. 2862, 81 L.Ed.2d 815 (1984).  The Court has also held that the government may
> take property from a party that fails to maintain it and transfer the property to another
> private party, where the recipient will provide appropriate upkeep of the property and
> thereby allow the government to use it.  *Nat'l R.R. Passenger Corp. v. Boston &
> Maine Corp.*, 503 U.S. 407, 422-23, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992).

*Carole Media*, 550 F.3d at 310.  In order to defeat a motion to dismiss, a plaintiff asserting a claim

under the Public Use Clause must make "a plausible accusation of impermissible favoritism."  *Id.*

at 311, quoting *Kelo*, 545 U.S. at 491 (Kennedy, J., concurring).  In other words, a complaint must

contain allegations indicating that the challenged taking was *not* "rationally related to a conceivable

public purpose" in order to state a claim for relief under the Public Use Clause.  *Midkiff*, 467 U.S.

at 241.

Two separate sections of Pennsylvania's URL authorize a redevelopment authority to

condemn private property.  Section 9 of the URL, which is codified at 35 PA. STAT. § 1709, lists the

powers possessed by a redevelopment authority.  The statutory language specifically relevant to the

instant case provides:

### § 1709.  Powers of an Authority

An Authority shall constitute a public body, corporate and politic, exercising public powers of the Commonwealth as an agency thereof, which powers shall include all powers necessary or appropriate to carry out and effectuate the purposes and provisions of this act, including the following powers in addition to those herein otherwise granted:

\*\*\*

(i) To acquire by eminent domain any real property, including improvements and fixtures for the public purposes set forth in this act, in the manner hereinafter provided, *except real property located outside a redevelopment area*;

\*\*\*

35 PA. STAT. § 1709(i)(emphasis added).  As the statutory language makes clear, a redevelopment authority's power to acquire real property by means of eminent domain proceedings under § 1709(i) extends only to real property located within a "redevelopment area."  The term "redevelopment area" is defined as "[a]ny area, whether improved or unimproved, which a planning commission may find to be blighted because of the existence of the conditions enumerated in section two of [the URL] so as to require development under the provisions of [the URL]."  35 PA. STAT. § 1703(n).  The portion of Section 2 pertinent to this case is codified at 35 PA. STAT. § 1702(a), which provides:

§ 1702.  Findings and declaration of policy
It is hereby determined and declared as a matter of legislative finding--
(a) That there exist in urban communities in this Commonwealth areas which have become blighted because of the unsafe, unsanitary, inadequate or over-crowded condition of the dwellings therein, or because of inadequate planning of the area, or excessive land coverage by the buildings thereon, or the lack of proper light and air and open space, or because of the defective design and arrangement of the buildings thereon, or faulty street or lot layout, or *economically* or socially *undesirable land uses*.

35 PA. STAT. § 1702(a)(emphasis added).  The URL contains a statutory mechanism providing for the preparation and adoption of a redevelopment proposal.  35 PA. STAT. § 1710.

A redevelopment authority may acquire real property located outside of a redevelopment area "by purchase, gift, bequest, eminent domain or otherwise," only if the property is "blighted" under Section 12.1 of the URL. 35 PA. STAT. § 1712.1(a). The exercise of this power is "conditioned upon the creation or existence of a blighted property review committee by ordinance of the governing body of the municipality." 35 PA. STAT. § 1712.1(b). Section 12.1(c) of the URL, which is codified at 35 PA. STAT. § 1712.1(c), enumerates the criteria for determining whether a parcel of real property is blighted. 35 PA. STAT. § 1712.1(c).

It is undisputed that the parcels of property owned by Hamilton and the Whittakers have never been "blighted" within the meaning of § 1712.1(c).[3] The declarations of taking at issue in this

[3]The relevant statutory language provides:
**§ 1712.1.  Blighted property removal**

***

(c) Blighted property shall include:
(1) Any premises which because of physical condition or use is regarded as a public nuisance at common law or has been declared a public nuisance in accordance with the local housing, building, plumbing, fire and related codes.
(2) Any premises which because of physical condition, use or occupancy is considered an attractive nuisance to children, including but not limited to abandoned wells, shafts, basements, excavations, and unsafe fences or structures.
(3) Any dwelling which because it is dilapidated, unsanitary, unsafe, vermin-infested or lacking in the facilities and equipment required by the housing code of the municipality, has been designated by the department responsible for enforcement of the code as unfit for human habitation.
(4) Any structure which is a fire hazard, or is otherwise dangerous to the safety of persons or property.
(5) Any structure from which the utilities, plumbing, heating, sewerage or other facilities have been disconnected, destroyed, removed, or rendered ineffective so that the property is unfit for its intended use.
(6) Any vacant or unimproved lot or parcel of ground in a predominantly built-up-neighborhood, which by reason of neglect or lack of maintenance has become a place for accumulation of trash and debris, or a haven for rodents or other vermin.
(7) Any unoccupied property which has been tax delinquent for a period of two years prior to the effective date of this act, and those in the future having a two year tax delinquency.
(8) Any property which is vacant but not tax delinquent, which has not been rehabilitated within one year of the receipt of notice to rehabilitate from the appropriate code enforcement agency.
(9) Any abandoned property.  A property shall be considered abandoned if:
      (i) it is a vacant or unimproved lot or parcel of ground on which a municipal lien for the cost of demolition of any structure located on the property remains unpaid for a period of six months;

case were grounded in § 1709(i).  Judge Piccione overruled the Plaintiffs' preliminary objections

concerning the Planning Commission's finding of "blight" on the ground that the preexisting use of

the Millennium Park site had been "economically undesirable" within the meaning of § 1702(a).

(Docket No. 50-3, p. 26).  On appeal, the Commonwealth Court reversed this determination.  *In Re:*

*Condemnation by the RALC*, 962 A.2d at 1262-1265.  The Commonwealth Court explained that the

meaning of the term "economically undesirable land use" did not simply refer to a preexisting land

use that was less profitable than that envisioned by the advocates of the proposed development, but

rather to "an actual, objectively negative use of the property."  *Id.* at 1263.  Speaking through

President Judge Leadbetter, the Commonwealth Court declared:

> The term "economically undesirable land uses," as used in Section 2 of the URL,
> does not mean property that is merely put to a use other than the most economically
> profitable.  Such an understanding of the term fails to focus the inquiry on the actual
> condition of the properties labeled as "blighted" and instead improperly focuses the
> inquiry on a comparison of the present use with the proposed redevelopment use.
> The terms in Section 2, such as "unsafe, unsanitary, overcrowded," are not relative
> descriptors that mean less safe, less sanitary or more crowded; rather, the terms
> describe actual conditions of deterioration.  In order for an area comprising several
> properties to qualify as unsafe, unsanitary or overcrowded, the area must contain at
> least some properties in a condition that a reasonable person would conclude met the
> ordinarily understood meaning of these terms.  We construe "economically
> undesirable" in the same manner, as describing an actual, objectively negative use of
> the property rather than merely a use relatively less profitable than another.

*Id.*  This decision was based on "the starting premise that the *public purpose* underlying a

---

(ii) it is a vacant property or vacant or unimproved lot or parcel of ground on which the
total of municipal liens on the property for tax or any other type of claim of the
municipality are in excess of 150% of the fair market value of the property as established
by the Board of Revisions of Taxes or other body with legal authority to determine the
taxable value of the property; or
(iii) the property has been declared abandoned by the owner, including an estate that is in
possession of the property.
35 PA. STAT. § 1712.1(c).

24

condemnation under the URL [was] the 'elimination of blighted areas.'" *Id.* at 1264 (emphasis

added). Because this particular "public purpose" was absent, the Commonwealth Court concluded

that the parcels of property owned by the Plaintiffs were not subject to condemnation under the URL.

*Id.* at 1265.

The Commonwealth Court's decision was clearly based on § 1702(a) rather than on the

Public Use Clause. This reality is reflected in the following paragraph contained in the

Commonwealth Court's opinion:

> The critical issue before us is whether the URL, in specifying "economically undesirable use" among the criteria listed in Section 2 that render an area blighted, opens the door to a condemnation for purely "economic development." In *Kelo v. City of New London*, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), the United States Supreme Court upheld a condemnation of residential buildings that were clearly not blighted in the sense of dilapidated but were located in a certified redevelopment area targeted for revitalization pursuant to a carefully considered plan, which included razing the residences to build a pharmaceutical research facility. The redevelopment authority had complied with the relevant municipal redevelopment statute, thus conferring a presumption of legitimacy on the selection of the geographic area targeted for redevelopment. *See id. at 483* ("Those who govern the City were not confronted with the need to remove blight in the Fort Trumbull area, but their determination that the area was sufficiently distressed to justify a program of economic rejuvenation is entitled to our deference"). The only question before the Court was whether the "economic development" of the site constituted a public purpose sufficient to justify the condemnation under the constraints of the Fifth Amendment of the United States Constitution. The Court answered this question in the affirmative, stating: "promoting economic development is a traditional and long accepted function of government" and "there is, moreover, no principled way of distinguishing economic development from the other public purposes that we have recognized." *Id. at 484*. The Court nevertheless recognized that, while the relevant local redevelopment statute opened the door to a taking for purely economic development, nothing precluded a state from imposing stricter public use requirements than that imposed under the federal baseline. We conclude that our Pennsylvania legislature did just that; proper construction of the URL does not authorize the condemnation of property (lacking the ordinarily understood indicia of blight), such as that at issue here, for purely economic development.

25

*Id.* at 1263.  The determination that the challenged takings were not in conformity with Pennsylvania law is, of course, conclusive in the instant proceeding.  28 U.S.C. § 1738; *San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323, 336-347 (2005).  The Court must proceed with the understanding that the takings were not justified by the "public purpose" embodied within the URL. As the Commonwealth Court's opinion makes clear, however, the *constitutionality* of the takings under the Public Use Clause has not yet been determined.

Under Pennsylvania law, title to "condemned" property transfers from the original owner to the condemning authority as soon as a declaration of taking is filed.  26 PA. CONS. STAT. § 302(a)(2). Therefore, the parcels of property owned by Hamilton and the Whittakers were "taken" within the meaning of the Fifth Amendment on July 29, 2004.  *Weingarten Realty Investors v. Albertson's, Inc.*, 66 F.Supp.2d 825, 841-845 (S.D.Tex. 1999).  The Plaintiffs were revested with title to their property when their preliminary objections were sustained on appeal.  26 PA. CONS. STAT. § 306(f)(1). Pennsylvania law entitles them to compensation "for reasonable appraisal, attorney and engineering fees and other costs and expenses actually incurred because of the condemnation proceedings."  26 PA. CONS. STAT. § 306(g)(1).  The Defendants advise the Court that a motion for such compensation filed by the Plaintiffs is currently pending before the Court of Common Pleas.  (Docket No. 162, p. 3).

The question presented for resolution is whether the parcels of property owned by the Plaintiffs were "taken" not for a constitutionally permissible "public use," but rather for a constitutionally proscribed private purpose.  The Plaintiffs aver that "the development of a high technology business park" does not constitute a "public use."  (Docket No. 126, ¶¶ 150-151).  They argue that since Pennsylvania law does not recognize private economic development as a "public

purpose," their property, which was indisputably taken for *that* purpose, was not "taken for public use" within the meaning of the Fifth Amendment. (Docket No. 163, pp. 2-7). Relying on *Daniels v. Area Plan Commission of Allen County*, 306 F.3d 445 (7th Cir. 2002), and *Young Partners, LLC v. Board of Education*, 160 P.3d 830 (Kan. 2007), the Defendants argue that the "public" nature of a particular "purpose" or "use" is not dependent upon whether such a purpose or use is specifically referenced by a State's eminent domain statute. (Docket No. 162, pp. 14-15).

In *Daniels*, the United States Court of Appeals for the Seventh Circuit acknowledged that the Supreme Court had "relied primarily, if not exclusively, upon legislative determinations of public purposes" contained within takings statutes in determining whether governmental action was consistent with the Public Use Clause. *Daniels*, 306 F.3d at 466. Nonetheless, the Court of Appeals went on to state that the Supreme Court had never held that the "sole source" of a "definable public use" was a specific eminent domain statute. *Id.* Responding to the argument that the Indiana Legislature had impermissibly delegated legislative authority to a distinct unit of government, the Court of Appeals observed that the United States Constitution did not mandate "any particular allocation or separation of powers" among the different branches of a State's government. *Id.* The Court of Appeals declared that even if it were assumed that the statute at issue were in violation of the Indiana Constitution, the alleged failure of Indiana to conform to its own law did not implicate federal law. *Id.* at 467. In *Young Partners*, the Kansas Supreme Court relied on *Daniels* to hold that the Fifth Amendment did not prohibit the Kansas Legislature from delegating to a state court the authority to determine whether a particular "purpose" or "use" was sufficiently "public" to justify an exercise of eminent domain power. *Young Partners*, 160 P.3d at 841-842.

While the reasoning employed in *Daniels* and *Young Partners* is persuasive, it does not speak

27

precisely to the circumstances of the present case.  The Pennsylvania Legislature has not failed or

declined to specify what "purposes" or "uses" are to be regarded as "public" enough to warrant the

condemnation of property.  Instead, the Pennsylvania Legislature has made it clear that property

"lacking the ordinarily understood indicia of blight" is not subject to condemnation under the URL

"for purely economic development."  *In Re: Condemnation by the RALC*, 962 A.2d at 1263.  The

applicable Pennsylvania statute, as construed by the Commonwealth Court, declares what is (and

what is *not*) a "public purpose."  *Id.* at 1263-1265.  Therefore, the relevant question is not whether

a purpose is properly regarded as "public" where a state legislature has simply failed to declare it as

such, but rather whether a "use" may be fairly characterized as "public" for constitutional purposes

where a state legislature has affirmatively declared (either explicitly or implicitly) that it is *not*

"public" for purposes of state law.[4]

The argument advanced by the Plaintiffs is premised on the idea that the Public Use Clause

incorporates limitations on eminent domain power grounded in state law, thereby making them

enforceable as a matter of federal constitutional law.  The Court finds this argument to be

unpersuasive.  The Plaintiffs cite to no authority which indicates that the words "public use"

contained in the Fifth Amendment mean something different in one State than they do in another,

depending on the precise content of state law.  The Court is not convinced that private economic

---

[4]The Court bases its understanding of legislative intent, for purposes of this case, on the Commonwealth
Court's construction of the URL.  *In Re: Condemnation by the RALC*, 962 A.2d 1257, 1263-1265 (Pa.Commw.Ct.
2008).  Dispositive weight is not placed on actions taken by the Pennsylvania Legislature subsequent to the "taking"
of the Plaintiffs' property on July 29, 2004.  Nevertheless, it is worth noting that after the United States Supreme
Court's decision in *Kelo v. City of New London*, 545 U.S. 469 (2005), the Pennsylvania Legislature enacted the
Property Rights Protection Act ("PRPA") [26 PA. CONS. STAT. § 201 *et seq.*].  The PRPA generally prohibits the use
of eminent domain power to acquire property that will ultimately be used for "private enterprise."  26 PA. CONS.
STAT. § 204(a).  Because the PRPA was not in effect at the time of the "takings" at issue, it has no bearing on the
Court's analysis in this case.

28

development, which was found to be a "public use" in *Kelo*, ceases to be a "public use" in Pennsylvania simply because Pennsylvania's eminent domain statute differs from that of Connecticut.

In *Virginia v. Moore*, 128 S.Ct. 1598, 1601 (2008), the Supreme Court held that the Fourth Amendment, which is applicable to the States by virtue of the Due Process Clause of the Fourteenth Amendment, did not preclude a police officer from "making an arrest based on probable cause but prohibited by state law." Although the arrest had clearly been illegal under Virginia law, the Supreme Court determined that it had not constituted an "unreasonable seizure" within the meaning of the Fourth Amendment. *Moore*, 128 S.Ct. at 1602-1608. Speaking through Justice Scalia, the Supreme Court observed that "linking Fourth Amendment protections to state law would cause them 'to vary from place to place and from time to time.'" *Id.* at 1607, quoting *Whren v. United States*, 517 U.S. 806, 815 (1996). This proposed result was deemed to be unacceptable, since the content of the Fourth Amendment was not dependent upon the particular requirements of a given State's law. *Moore*, 128 S.Ct. at 1604-1607. The Supreme Court concluded that the protections provided under the Fourth Amendment had a fixed content, and that an arrest which was otherwise "reasonable" thereunder did not become "unreasonable" simply because it was proscribed by state law. *Id.* at 1606.

The general principle underlying the decision in *Moore* applies with equal force in the present context. States are undoubtedly free to create "public use" standards that are more demanding than that contained in the Fifth Amendment. *Kelo*, 545 U.S. at 489. Pennsylvania has done just that. *In Re: Condemnation by the RALC*, 962 A.2d at 1263. Indeed, subsequent to the Supreme Court's decision in *Kelo*, the Pennsylvania Legislature passed legislation generally prohibiting the use of

eminent domain power for the purpose of facilitating "private enterprise."  26 Pa. Cons. Stat. §

204(a).  It does not follow, however, that actions taken in contravention of such state proscriptions

are likewise taken in contravention of the Public Use Clause.  The content of the Public Use Clause

does not "vary from place to place and from time to time."  *Whren*, 517 U.S. at 815.  The "public

use" requirement is "coterminous with the scope of a sovereign's police powers."  *Midkiff*, 467 U.S.

at 240.  It does not change based on how a particular sovereign chooses to *use* (or *not use*) its police

powers.  As far as the United States Constitution is concerned, a "public use" in Connecticut is a

"public use" in Pennsylvania.[5]  The Plaintiffs attempt to convert state statutory standards into federal

constitutional requirements, "[b]ut constitutional law does not work that way."  *Cruzan v. Director,*

*Missouri Dept. of Health*, 497 U.S. 261, 286 (1990).  If the Plaintiffs' argument were to be accepted,

every taking effectuated for a "purpose" proscribed by state law would be transformed into a federal

constitutional violation.  The reasoning employed by the Supreme Court in *Berman*, *Midkiff*,

*Ruckelshaus*, *National Railroad Passenger Corp.* and *Kelo* does not countenance such a result.

      In order to state a claim under the Public Use Clause, the Plaintiffs must allege an exercise

---

[5]The Court does not mean to suggest that the resolution of a federal constitutional question can never turn on a particular application of state law.  In some instances, a constitutional question cannot be addressed without reference to state law.  For example, a conviction is not secured in conformity with the Due Process Clause of the Fourteenth Amendment unless each element of the charged offense is proven "beyond a reasonable doubt."  *Yates v. Evatt*, 500 U.S. 391, 400 (1991).  Because this evidentiary requirement applies to "each element" of the crime at issue, the constitutional standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law."  *Jackson v. Virginia*, 443 U.S. 307, 324, n. 16 (1979).  Similarly, offers to engage in illegal transactions are categorically unprotected by the Free Speech Clause of the First Amendment.  *United States v. Williams*, 128 S.Ct. 1830, 1841-1842 (2008).  For this reason, a State which bans prostitution may independently prohibit a newspaper from publishing an advertisement soliciting prostitutes.  *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 388 (1973).  Since the illegality of the proposed transaction is precisely what renders the corresponding advertisement unprotected, the degree to which the advertisement enjoys (or does not enjoy) First Amendment protection can only be determined by reference to the content of the state law governing the transaction itself.  Thus, the particular requirements of state law are not always irrelevant to federal constitutional analysis.  In the present context, however, the intricacies of Pennsylvania law do not impact the Court's analysis.  The Plaintiffs have offered no persuasive argument as to why the specific provisions of the URL alter the meaning of the words "public use" contained in the Fifth Amendment.

of eminent domain power that was not "rationally related to a conceivable public purpose." *Midkiff*, 467 U.S. at 241.  The Plaintiffs' own averments indicate that "economic development" was the motivation for the Millennium Park project.  (Docket No. 126, ¶ 133).  As the Supreme Court observed in *Kelo*, the promotion of "economic development" is a "traditional and long accepted function of government." *Kelo*, 545 U.S. at 484.  The record of the proceedings conducted in the Pennsylvania courts contains evidence that the project was viewed as a significant job-creation endeavor.  (Docket No. 50-3, pp. 10-15).  This is not a situation in which a State, through the exercise of its eminent domain authority, has transferred a parcel of property from one private individual to another *outside* of the confines of an "integrated development plan." *Kelo*, 545 U.S. at 487.  In this case, it is undisputed that the Plaintiffs' property was "taken" solely to facilitate the development of the Millennium Park site.  The development of that site was, at a minimum, "rationally related to a conceivable public purpose." *Midkiff*, 467 U.S. at 241.  The Public Use Clause required nothing more.

The Plaintiffs allege that the RALC illegally delegated its authority to the LCEDC.  (Docket No. 126, ¶¶ 134-135).  They also allege that the RALC was an "empty shell corporation" created solely for the purpose of condemning their property.  (*Id.*, ¶ 141).  As *Daniels* and *Young Partners* make clear, however, these matters do not implicate the Fifth Amendment. *Daniels*, 306 F.3d at 466-467; *Young Partners*, 160 P.3d at 410-413.  "[I]t is only [a] taking's *purpose*, and not its *mechanics*, that must pass scrutiny under the Public Use Clause." *Midkiff*, 467 U.S. at 244 (emphasis added).  Because the purpose of the challenged takings was undoubtedly "public" as defined in *Berman*, *Midkiff*, *Ruckelshaus*, *National Railroad Passenger Corp.* and *Kelo*, the second amended

complaint alleges no violation of the Fifth Amendment.[6]   Accordingly, the Defendants' motion to dismiss must be granted with respect to Count I of the second amended complaint.  (Docket No. 126, ¶¶ 147-154).

### B.      The Equal Protection Clause Claims

The Plaintiffs aver that the Defendants violated their rights under the Equal Protection Clause.  (Docket No. 126, ¶¶ 155-164).  The Equal Protection Clause provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST., AMEND. XIV, § 1.  The Supreme Court has made it clear that this constitutional provision limits the actions of executive officials as well as the permissible scope of legislative enactments.  *Yick Wo v. Hopkins*, 118 U.S. 356, 373-374 (1886).  The primary purpose of the Equal Protection Clause is "to secure every person within [a] State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by [the] express terms of a statute or by its improper execution through duly constituted agents."  *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923).  In *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), the Supreme Court declared that state-occasioned discrimination against a particular individual (i.e., discrimination against a "class of one") violates the Equal Protection Clause where there is "no rational basis" for treating the aggrieved individual "differently from others similarly situated."

The Equal Protection Clause "creates no substantive rights."  *Vacco v. Quill*, 521 U.S. 793, 799 (1997).  "Instead, it embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly."  *Id.*  The Plaintiffs do not allege that they have been classified pursuant

---

[6]The Defendants argue that the Plaintiffs' Takings Clause claims are assertable only against the RALC, and not against the other parties named in the second amended complaint.  (Docket No. 162, pp. 10-11).  The Court need not decide that issue, since the Plaintiffs do not properly allege Takings Clause violations in any event.

to a suspect or quasi-suspect trait, nor do they allege a classification which has burdened their exercise of a fundamental right.[7]   (Docket No. 126, ¶¶ 155-164).   Therefore, the challenged classification was lawful as long as it was rationally related to a legitimate governmental interest. *Central State University v. American Association of University Professors*, 526 U.S. 124, 127-128 (1999); *Romer v. Evans*, 517 U.S. 620, 631 (1996); *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

The Plaintiffs aver that, at the time of the takings, they were similarly situated with other property owners residing in Lawrence County, whose parcels of real property were not "blighted" within the meaning of the URL, and whose parcels of property were never "taken."  (Docket No. 126, ¶ 160).  They further aver that there was "no rational basis" for this difference in treatment. (*Id.*, ¶ 162).  The Plaintiffs allege that the Defendants took their property solely because they were unwilling to sell it.  (*Id.*).

The argument advanced by the Plaintiffs is manifestly unpersuasive.  The record indicates that, at the time of the takings, the parcels of property owned by Hamilton and the Whittakers were the *only* parcels of property located within the Millennium Park site that had not been purchased by the LCEDC.  *In Re: Condemnation by the RALC*, 962 A.2d at 1259.  The LCEDC had already purchased the other 88% of the site.  *Id.*  Thus, no other owners possessed unacquired property located within the Millennium Park site.  At a minimum, a plaintiff asserting a "class of one" claim under the Equal Protection Clause must allege that he or she was treated differently from others *similarly situated*, and that there was *no rational basis* for such disparate treatment.  *Phillips*, 515 F.3d at 243.  This standard is not satisfied by an allegation that a State (or state official) has

---

[7]To the extent that the Plaintiffs subjectively believe that the classification at issue burdened their exercise of a fundamental right, they are mistaken.  As the Court has already explained, the takings at issue in this case did not violate the Fifth Amendment.

exercised discretionary authority in an individualized manner.  In *Engquist v. Oregon Dept. of Agriculture*, 128 S.Ct. 2146 (2008), the Supreme Court explained:

> There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments.  In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted.  In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.
>
> Suppose, for example, that a traffic officer is stationed on a busy highway where people often drive above the speed limit, and there is no basis upon which to distinguish them.  If the officer gives only one of those people a ticket, it may be good English to say that the officer has created a class of people that did not get speeding tickets, and a "class of one" that did.  But assuming that it is in the nature of the particular government activity that not all speeders can be stopped and ticketed, complaining that one has been singled out for no reason does not invoke the fear of improper government classification.  Such a complaint, rather, challenges the legitimacy of the underlying action itself–the decision to ticket speeders under such circumstances.  Of course, an allegation that speeding tickets are given out on the basis of race or sex would state an equal protection claim, because such discriminatory classifications implicate basic equal protection concerns.  But allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action.  It is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective or individualized.

*Engquist*, 128 S.Ct. at 2154.  In this case, the Defendants clearly had a "discernible or articulable reason" for condemning *only* the property owned by the Plaintiffs.  The Plaintiffs acknowledge that the reason for the takings was the development of the Millennium Park site.  (Docket No. 126, ¶ 18). It was certainly rational for the Defendants, in seeking to develop the Millennium Park site, to condemn *only* parcels of property located within that site.

The Plaintiffs allege no violation of the Equal Protection Clause.  The Defendants' motion

34

to dismiss must be granted with respect to Count II of the second amended complaint.  (Docket No. 126, ¶¶ 155-164).

### C.      The Procedural Due Process Claims

The Due Process Clause of the Fourteenth Amendment provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. CONST., AMEND. XIV, § 1.  The essential requirements of "due process" are notice and an opportunity to be heard.  *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 545-548 (1985).  The Due Process Clause "raises no impenetrable barrier to the taking of a person's possessions."  *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).  Instead, it merely requires that state-occasioned deprivations of liberty and property interests be effectuated in accordance with "due process of law."  *Parratt v. Taylor*, 451 U.S. 527, 537 (1981), overruled on other grounds by *Daniels v. Williams*, 474 U.S. 327, 328-331 (1986).

In any case involving a procedural due process claim, the first question for consideration is whether the plaintiff has been "deprived" of a constitutionally-protected liberty or property interest.  This inquiry is twofold.  First, the plaintiff must establish the *existence* of such an interest.  The Supreme Court has made it clear that "the range of interests protected by procedural due process is not infinite."  *Board of Regents v. Roth*, 408 U.S. 564, 570 (1972).  A "benefit" does not constitute a constitutionally-protected liberty or property interest if government officials are free to grant or deny it at their discretion.  *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005).  In order to have a "property interest" in a benefit, an individual must have "a legitimate claim of entitlement to it," not merely a "unilateral expectation of it."  *Roth*, 408 U.S. at 577.  Such entitlements are not necessarily created by the Constitution.  Instead, they can derive their origin and content from a

35

source independent of the Constitution, such as state law.  *Paul v. Davis*, 424 U.S. 693, 709 (1976).

In the absence of an entitlement, there is no interest for the Due Process Clause to protect.  *Olim v.*

*Wakinekona*, 461 U.S. 238, 250-251 (1983).  Once the existence of a property interest has been

established, the plaintiff must show that he or she has been "deprived" of it.  *Daniels*, 474 U.S. at

331-336.  Not every action that *affects* a property interest constitutes a *deprivation* of that interest.

*College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666,

674 (1999).

In this case, the Court does not understand the Defendants to argue that the Plaintiffs were

never deprived of property interests.  It is undisputed that the Plaintiffs' interest in retaining title to

their real property was entitled to constitutional protection.[8]  When the declarations of taking were

filed on July 29, 2004, title to the Plaintiffs' property was transferred to the RALC.  26 PA. STAT.

§ 302(a)(2).  Moreover, the "takings" were *deliberate* rather than accidental.  Therefore, the

Plaintiffs were "deprived" of their property within the meaning of the Fourteenth Amendment.

*Daniels*, 474 U.S. at 331-332.

Because the Plaintiffs properly allege that they were deprived of property interests entitled

to constitutional protection, the next question for consideration is whether such deprivations were

effected "without due process of law."  U.S. CONST., AMEND. XIV, § 1.  "The very nature of due

process negates any concept of inflexible procedures universally applicable to every imaginable

situation."  *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895 (1961).  Unlike

---

[8]The word "property" has a more narrow meaning as used in the Takings Clause than it does as used in the
Due Process Clause.  *Burns v. Pennsylvania Dept. of Correction*, 544 F.3d 279, 285, n. 3 (3d Cir. 2008).  Thus,
some property interests may be "taken" without "just compensation" even though an owner may not be deprived of
them "without due process of law."  *Id.*  Since it is undisputed that the parcels of property owned by Hamilton and
the Whittakers were "property" within the meaning of the Takings Clause, it follows *a fortiori* that they were
"property" within the meaning of the Due Process Clause.

some legal principles, "due process of law" "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 162 (1951)(Frankfurter, J., concurring).  Once it is determined that the Due Process Clause is implicated by a specific deprivation of liberty or property, the relevant question becomes "what process is due" under the particular circumstances.  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "The standard for determining what process is due in a given situation is rather flexible, since the due process inquiry eschews reliance on rigid mandates in favor of an approach which accounts for the factual circumstances of the particular situation at issue."  *Tristani v. Richman*, 609 F.Supp.2d 423, 481 (W.D.Pa. 2009).  In *Matthews v. Eldridge*, 424 U.S. 319 (1976), the Supreme Court identified the factors that a court must consider in determining "what process is due" in a given situation by stating as follows:

> More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Matthews*, 424 U.S. at 334-335.  These factors determine the "appropriate level of process" required in order for a "deprivation" of liberty or property to be in accordance with the Due Process Clause. *Garcia v. City of Albuquerque*, 232 F.3d 760, 769 (10th Cir. 2000).  Once the "appropriate level of process" has been identified, "the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of [an individual's] substantive assertions."  *Carey v. Piphus*, 435 U.S. 247, 266 (1978).

37

In circumstances in which a deprivation is occasioned by an unauthorized, random act of a state official, and not through the use of an established state procedure, the Due Process Clause is satisfied by the availability of an adequate postdeprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). The Constitution does not require a State to engage in the "impossible" task of employing predeprivation procedures prior to every unanticipated action taken by its employees. *Brown v. Muhlenberg Township*, 269 F.3d 205, 213 (3d Cir. 2001). On the other hand, where a deprivation occurs in "the more structured environment of established state procedures," the availability of a postdeprivation remedy does not necessarily satisfy the requirements of the Due Process Clause. *Hellenic American Neighborhood Action Committee v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996). Where important private interests are at stake, the Due Process Clause often requires a hearing *before* an individual is deprived of liberty or property. *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970). Under circumstances in which predeprivation process is constitutionally required but not provided, no level of postdeprivation process is adequate to satisfy the Constitution. *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 417 (3d Cir. 2008).

The Plaintiffs do not clearly identify the level of process that they believe to have been required under the circumstances of this case. Instead, they aver that the Defendants failed to comply with specific provisions of the URL.[9] (Docket No. 126, ¶ 169). Nonetheless, a mere violation of a state statute does not necessarily constitute a violation of the Due Process Clause. *Thielman v.*

---

[9]The Plaintiffs allege that the Defendants failed to create a blighted property review committee ("BPRC") in conformity with 35 PA. STAT. § 1712.1(b). (Docket No. 126, ¶ 86). They also aver that the Defendants failed to comply with the notice requirements of § 1712.1(e)(2). (*Id.*, ¶¶ 88, 91). Nevertheless, the record indicates that the parcels of property owned by Hamilton and the Whittakers were condemned pursuant to § 1709, and not pursuant to § 1712.1. *In Re: Condemnation by the RALC*, 962 A.2d 1257, 1260-1262 (Pa.Commw.Ct. 2008). The Commonwealth Court construed these distinct provisions of the URL to create separate mechanisms for condemning property. *Id.* at 1260-1261.

*Leean*, 140 F.Supp.2d 982, 993 (W.D.Wis. 2001). While state law may be the source of a property interest entitled to constitutional protection, it does not govern the constitutional analysis concerning the level of process necessary in order to effect a lawful deprivation of that interest. *Davis v. Scherer*, 468 U.S. 183, 193, n. 11 (1984). The Due Process Clause, which exists independently of state law, controls the question of whether a given deprivation has been effected "without due process of law." *Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir. 1988). The Plaintiffs cannot allege a violation of the Fourteenth Amendment simply by averring that the actions of the Defendants were not in conformity with Pennsylvania law. *Snowden v. Hughes*, 321 U.S. 1, 11 (1944).

Before determining whether the Plaintiffs were deprived of property "without due process of law," the Court must determine what level of process was required under the circumstances of this case. A careful review of the applicable jurisprudence reveals that, in this context, property owners are not constitutionally entitled to a hearing *prior* to a State's exercise of its eminent domain authority. In *Bragg v. Weaver*, 251 U.S. 57 (1919), the Supreme Court made the following observations:

> It is conceded that the taking is under the direction of public officers and is for a public use; also that adequate provision is made for the payment of such compensation as may be awarded. Hence no discussion of these matters is required. The objection urged against the statute is that it makes no provision for affording the owner an opportunity to be heard respecting the necessity or expediency of the taking or the compensation to be paid.
> Where the intended use is public, the necessity and expediency of the taking may be determined by such agency and in such mode as the State may designate. They are legislative questions, no matter who may be charged with their decision, and a hearing thereon is not essential to due process in the sense of the Fourteenth Amendment.
> But it is essential to due process that the mode of determining the compensation be such as to afford the owner an opportunity to be heard. Among

39

> several admissible modes is that of causing the amount to be assessed by viewers,
> subject to an appeal to a court carrying with it a right to have the matter determined
> upon a full trial.  And where this mode is adopted due process does not require that
> a hearing before the viewers be afforded, but is satisfied by the full hearing that may
> be obtained by exercising the right to appeal.

*Bragg*, 251 U.S. at 58-59 (internal citations omitted).  Since its decision in *Bragg*, the Supreme

Court has consistently held that a property owner is not entitled to a predeprivation hearing prior to

being dispossessed of his or her property for a public use.  *Bailey v. Anderson*, 326 U.S. 203, 205

(1945); *North Laramie Land Co. v. Hoffman*, 268 U.S. 276, 284 (1925); *Georgia v. City of

Chattanooga*, 264 U.S. 472, 483 (1924); *Joslin Manufacturing Co. v. City of Providence*, 262 U.S.

668, 678-679 (1923).  In more recent times, other courts have reiterated that the Due Process Clause

does not require the propriety of a taking to be determined at a predeprivation hearing.  *Montgomery

v. Carter County*, 226 F.3d 758, 768-769 (6th Cir. 2000); *United States v. 131.68 Acres of Land*, 695

F.2d 872, 876 (5th Cir. 1983); *Fulcher v. United States*, 604 F.2d 295, 297 (4th Cir. 1979); *Rassi v.

Trunkline Gas Co.*, 240 N.E.2d 49, 53 (Ind. 1968); *Reel Pipe & Valve Co., Inc. v. Consolidated City

of Indianapolis-Marion County*, 633 N.E.2d 274, 278 (Ind.Ct.App. 1994); *Vecchione v. Township

of Cheltenham*, 320 A.2d 853, 855 (Pa.Commw.Ct. 1974).

  The Court acknowledges the importance that the Plaintiffs placed on retaining ownership of

their property notwithstanding the fact that they could not be divested of such ownership in the

absence of "just compensation."  Nevertheless, the independent protections provided under the

Takings Clause directly affect the question of what procedures were required under the Due Process

Clause.  Because the category of "property" protected under the Due Process Clause is broader than

the category of "property" protected under the Takings Clause, a State can deprive individuals of

some property interests without paying just compensation. *Burns v. Pennsylvania Dept. of Correction*, 544 F.3d 279, 285, n. 3 (3d Cir. 2008). A State faces "heavier demands" under the Due Process Clause when it attempts to deprive an individual of a property interest without paying just compensation than it does when it attempts to exercise its eminent domain power, which can only be exercised in connection with the payment of just compensation. *Virgin Islands Hotel Association, (U.S.), Inc. v. Virgin Islands Water & Power Authority*, 476 F.2d 1263, 1267, n. 7 (3d Cir. 1973). Since the "unique safeguards" required by the Takings Clause provide adequate protection to property owners, governmental entities are not required to conduct predeprivation hearings before "taking" private property for a public use. *Presley v. City of Charlottesville*, 464 F.3d 480, 489-490 (4th Cir. 2006).

As noted earlier, title to the Plaintiffs' property was transferred to the RALC on July 29, 2004, when the declarations of taking were filed. 26 PA. CONS. STAT. § 302(a)(2). Title to the property was revested in the Plaintiffs when their preliminary objections were sustained on appeal. 26 PA. CONS. STAT. § 306(f)(1). The Plaintiffs do not deny that Pennsylvania law provided them with postdeprivation remedies which were adequate to redress the wrongful deprivations of their parcels of real property.[10] Indeed, they ultimately succeeded in their efforts to invalidate the challenged takings in the Pennsylvania courts. *In Re: Condemnation by the RALC*, 962 A.2d at 1264-1265. Under Pennsylvania law, the Plaintiffs are entitled to "reasonable appraisal, attorney and engineering fees and other costs and expenses actually incurred because of the condemnation proceedings." 26 PA. CONS. STAT. § 306(g)(1). A motion for such fees, costs and expenses is

---

[10]The situation would be entirely different if the Plaintiffs had not received sufficient notice of the condemnation proceedings to alert them of their need to assert their rights in a Pennsylvania court. *Schroeder v. City of New York*, 371 U.S. 208, 210-214 (1962).

presently pending before the Court of Common Pleas.  (Docket No. 162, p. 3).  Nothing more is required under the Due Process Clause.  *Vecchione*, 320 A.2d at 265.  In this case, the "special nature" of the protections provided under the Takings Clause, when coupled with the postdeprivation remedies available under Pennsylvania law, were adequate to ensure that the Plaintiffs were not deprived of their property "without due process of law."[11]  *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195, n. 14 (1985).

The averments contained in Count III of the second amended complaint are insufficient to establish procedural due process violations.  (Docket No. 126, ¶¶ 165-170).  Consequently, the Plaintiffs' procedural due process claims must be dismissed.

### D.    The Substantive Due Process Claims

In addition to requiring state-occasioned deprivations of liberty and property interests to be effectuated in accordance with "due process of law," the Due Process Clause has been construed to contain a substantive component barring certain governmental actions "regardless of the fairness of the procedures used to implement them."  *Daniels*, 474 U.S. at 331.  Nonetheless, the Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."  *Collins*, 503 U.S. at 125.  In *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998), the Supreme Court explained

---

[11] The Plaintiffs' argument that the Defendants' conduct was "arbitrarily and adversely predetermined" is unavailing.  (Docket No. 163, p. 16).  That argument relates solely to predeprivation procedures that were *not* required under the Constitution.  *Bailey v. Anderson*, 326 U.S. 203, 205 (1945).  Even if predeprivation hearings were constitutionally required in this context, it is not clear that the Plaintiffs' allegations would be sufficient to establish violations of the Due Process Clause.  The Plaintiffs were given advance notice of the hearing conducted before the Lawrence County Commissioners on May 11, 2004.  *Reilly v. City of Atlantic City*, 532 F.3d 216, 236 (3d Cir. 2008)(observing that "the availability and validity of any pre-deprivation process must be analyzed with reference to the context of the alleged violation and the adequacy of available post-deprivation procedures"); *Alvin v. Suzuki*, 227 F.3d 107, 119 (3d Cir. 2000)(observing that "[t]he Constitution does not require perfection at every stage of a process").  The Plaintiffs do not allege that the proceedings in the Pennsylvania courts were "arbitrarily and adversely predetermined."  Indeed, the Plaintiffs ultimately prevailed in those proceedings.

that, "in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  The conscience-shocking concept "duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." *Lewis*, 523 U.S. at 848.  "At one end of the spectrum is negligence, which is categorically insufficient to constitute conscience-shocking conduct for purposes of the Due Process Clause." *Taylor v. Altoona Area School District*, 513 F.Supp.2d 540, 565 (W.D.Pa. 2007); see also *Davidson v. Cannon*, 474 U.S. 344, 348 (1986)("The guarantee of due process has never been understood to mean that the State must guarantee due care on the part of its officials.").  "At the other end of the spectrum is conduct intended to cause unwarranted injury, which is very likely to constitute conscience-shocking conduct." *Taylor*, 513 F.Supp.2d at 565; see also *Lewis*, 523 U.S. at 849 ("It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any governmental interest is the sort of official action most likely to rise to the conscience-shocking level.").  "Whether the point of the conscience-shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls." *Lewis*, 523 U.S. at 849 (internal citation and internal quotation marks omitted).  The point at which conduct becomes conscience-shocking for constitutional purposes is a question of law for a court to decide, not a question of fact amenable to resolution by a jury. *Luckes v. County of Hennepin*, 415 F.3d 936, 940 (8th Cir. 2005); *Benn v. Universal Health System, Inc.*, 371 F.3d 165, 174 (3d Cir. 2004); *Armstrong v. Squadrito*, 152 F.3d

43

564, 571 (7th Cir. 1998); *United States v. Elmardoudi*, 611 F.Supp.2d 872, 876 (N.D.Iowa 2007);

*J.D. Partnership v. Berlin Township Board of Trustees*, 412 F.Supp.2d 772, 779 (S.D.Ohio 2005);

*Crowe v. County of San Diego*, 359 F.Supp.2d 994, 1030-1031 (S.D.Cal. 2005); *Johnson v. Herman*,

132 F.Supp.2d 1130, 1141 (N.D.Ind. 2001).

      Before addressing the merits of the Plaintiffs' substantive due process claims, the Court must

consider the threshold question of whether substantive due process analysis is appropriate in a case

such as this.  The Supreme Court has made it clear that where a particular provision of the Bill of

Rights "'provides an explicit textual source of constitutional protection' against a particular sort of

government behavior," that provision, not "the more generalized notion of 'substantive due

process,'" must be the guide for analyzing claims based on that type of government behavior.

*Albright v. Oliver*, 510 U.S. 266, 273 (1994)(plurality opinion), quoting *Graham v. Connor*, 490 U.S.

386, 395 (1989).  Because the Takings Clause specifically governs claims of the kind alleged by the

Plaintiffs in this case, it is at least arguable that their substantive due process claims are not

cognizable.  *Montgomery*, 226 F.3d at 769-770; *Forseth v. Village of Sussex*, 20 F.Supp.2d 1267,

1271 (E.D.Wis. 1998).  Nevertheless, in *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 543 (2005),

the Supreme Court observed that a governmental action could be constitutionally impermissible

"because it fails to meet the 'public use' requirement or is so arbitrary as to violate due process."

This language from *Lingle* indicates that substantive due process analysis is appropriate under

circumstances in which an arbitrary taking is alleged.[12]  Thus, the Court will consider the merits of

---

[12]The Court notes that the United States Court of Appeals for the Third Circuit, in an unpublished decision involving some of the same defendants named in the second amended complaint, indicated that substantive due process analysis is generally appropriate in this context.  *Theodorou v. Measel*, 53 Fed.Appx. 640, 642-643 (3d Cir. 2002).

the Plaintiffs' substantive due process claims.

The Plaintiffs base their substantive due process claims on the fact that their property was "taken" even though it was not "blighted" within the meaning of the URL. (Docket No. 126, ¶ 175). In order to establish that the interest-depriving actions of a governmental entity or official constituted a substantive due process violation, a plaintiff must show *both* that the particular interest at issue was entitled to constitutional protection *and* that the government's deprivation of that protected interest occurred in a conscience-shocking manner. *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008). Not all property interests entitled to *procedural* due process protection are entitled to *substantive* due process protection. *Gikas v. Washington School District*, 328 F.3d 731, 732-733 (3d Cir. 2003). Nonetheless, the United States Court of Appeals for the Third Circuit has declared an individual's interest in owning real property to be sufficiently "fundamental" to be worthy of substantive due process protection. *Nicholas v. Pennsylvania State University*, 227 F.3d 133, 141 (3d Cir. 2000). Therefore, the Plaintiffs had "fundamental" property interests in retaining ownership of their respective portions of the real property located within the Millennium Park site.

The next question for consideration is whether the Plaintiffs allege conduct that was so "fatally arbitrary" as to be not merely tortious, but unconstitutional. *Lewis*, 523 U.S. at 846. States of mind such as specific intent, gross negligence and deliberate indifference have been found to be conscience-shocking in various contexts. *Phillips*, 515 F.3d at 241. Only mere negligence is categorically beyond the purview of the Due Process Clause. *Davidson*, 474 U.S. at 348 ("As we held in *Daniels*, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). In any event, where courts have spoken of an *intent* or *purpose* to cause harm, *Lewis*, 523 U.S. at 836, a *reckless disregard* as to whether

45

harm would result from a particular act or omission, *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir.

2009), or a *deliberate indifference* as to whether a given course of conduct would lead to harm,

*Natale v. Camden County Correctional Facility*, 318 F.3d 575, 582 (3d Cir. 2003), they have

generally referred to *harm* that bears no rational relationship to a "legitimate object" of governmental

power. *Lewis*, 523 U.S. at 836.  Most of the decisions in this circuit discussing the various levels

of conscience-shocking culpability have involved situations in which the actions or omissions of

state officials have resulted in some form of bodily harm or personal injury to an individual. *Walter*

*v. Pike County*, 544 F.3d 182, 192-194 (3d Cir. 2008); *Phillips*, 515 F.3d at 240-241; *Sanford v.*

*Stiles*, 456 F.3d 298, 307-311 (3d Cir. 2006); *Kaucher v. County of Bucks*, 455 F.3d 418, 425-427

(3d Cir. 2006); *Estate of Smith v. Marasco*, 430 F.3d 140, 153-156 (3d Cir. 2006); *A.M. v. Luzerne*

*County Juvenile Detention Center*, 372 F.3d 572, 579-588 (3d Cir. 2004); *Schieber v. City of*

*Philadelphia*, 320 F.3d 409, 411-423 (3d Cir. 2003); *Brown v. Pennsylvania Dept. of Health*

*Emergency Medical Services Training Institute*, 318 F.3d 473, 476-483 (3d Cir. 2003); *Ziccardi v.*

*City of Philadelphia*, 288 F.3d 57, 64-67 (3d Cir. 2002); *Nicini v. Morra*, 212 F.3d 798, 806-815 (3d

Cir. 2000).  It is axiomatic that no government has a legitimate interest in causing injury to persons

within its jurisdiction.  *Romer*, 517 U.S. at 634-635; *City of Cleburne v. Cleburne Living Center,*

*Inc.*, 473 U.S. 432, 446-447 (1985); *United States Dept. of Agriculture v. Moreno*, 413 U.S. 528, 534

(1973); *Feirson v. District of Columbia*, 315 F.Supp.2d 52, 63 (D.D.C. 2004).  For this reason, where

the actions or omissions of state officials cause personal injuries that are wholly unrelated to a

conceivable state interest, it is appropriate for a court to focus on whether the injuries suffered by

the aggrieved individuals resulted from "unhurried judgments" or "split-second" decisions of state

officials in determining whether the conduct of such officials can be properly characterized as

46

conscience-shocking. *Phillips*, 515 F.3d at 240-241.

In a case such as this, in which the governmental actions at issue were taken in pursuit of a legitimate interest within the purview of the State's police power, the relevant question is not how much time state officials had to make their decisions, but rather whether those decisions were rationally related to a legitimate governmental objective. *Braun v. Ann Arbor Charter Township*, 519 F.3d 564, 574 (6th Cir. 2008); *Good v. Borough of Steelton*, Civil Action No. 06-1736, 2008 WL 4454058, at *7-8, 2008 U.S. Dist. LEXIS 76820, at *29-32 (M.D.Pa. September 30, 2008).  The Court acknowledges that the Plaintiffs suffered "harm" in the sense that they were deprived of fundamental property interests.  Nevertheless, that type of harm is *intended* (but not necessarily *desired*) in *every* eminent domain proceeding.  That is why the Fifth Amendment exacts "just compensation" as the price of a taking.  *Berman*, 348 U.S. at 36.  The harm that a property owner suffers in the eminent domain context is purely incidental to an exercise of the State's police power.  Such state action does not run afoul of the Due Process Clause simply because the "harm" suffered by the property owner (i.e., the deprivation of a property interest) is caused intentionally.[13] Moreover, legitimate takings do not become substantive due process violations simply because the

---

[13] A singular focus on the mental state of a government official accused of violating the Due Process Clause presupposes that the official's actions were somehow unjustified.  Such a presupposition is sometimes appropriate.  A government never has a legitimate interest in subjecting a woman to rape, *United States v. Lanier*, 520 U.S. 259, 261-272 (1997), permitting a juvenile prison inmate to be physically assaulted by other inmates, *A.M. v. Luzerne County Juvenile Detention Center*, 372 F.3d 572, 579-588 (3d Cir. 2004), or rendering an individual a quadriplegic, *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 64-67 (3d Cir. 2002).  When the harm caused by a government official's conduct is unrelated to a legitimate interest within the purview of a sovereign's police power, arbitrariness can be presumed from a showing that the official acted with a specific intent or purpose to inflict such harm upon the aggrieved individual.  *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)(describing "conduct intended to injure in some way unjustifiable by any government interest" as "the sort of official action most likely to rise to the conscience-shocking level").  On the other hand, when the "harm" intentionally caused by a governmental action is purely incidental to an exercise of the State's police power, the challenged action can be characterized as "arbitrary" only if it is not rationally related to a legitimate state interest.  *Braun v. Ann Arbor Charter Township*, 519 F.3d 564, 574 (6th Cir. 2008).

state officials effectuating such takings act with improper motives. *United Artists Theatre Circuit, Inc. v. Township of Warrington*, 316 F.3d 392, 402 (3d Cir. 2003). This remains the case even where a state official's improper motive is "unrelated to the merits of the underlying decision." *Chainey*, 523 F.3d at 220.

The Commonwealth Court has conclusively determined that the takings at issue in this case were violative of Pennsylvania law. *In Re: Condemnation by the RALC*, 962 A.2d at 1265. The Plaintiffs allege that the Defendants acted in bad faith by condemning their property even though they knew that it was not "blighted" within the meaning of the URL. (Docket No. 126, ¶ 175). In any event, however, the Plaintiffs fail to allege a violation of the Due Process Clause. "A bad-faith violation of state law remains only a violation of state law." *United Artists Theatre Circuit, Inc.*, 316 F.3d at 402, quoting *Chesterfield Development Corp. v. City of Chesterfield*, 963 F.2d 1102, 1105 (8th Cir. 1992). More is required to establish a violation of the Fourteenth Amendment. *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 286 (3d Cir. 2004). "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Lewis*, 523 U.S. at 846, quoting *Collins*, 503 U.S. at 129.

In the second amended complaint, the Plaintiffs acknowledge that a desire to promote "economic development" was the reason for the Defendants' actions. (Docket No. 126, ¶ 133). The Supreme Court has recognized the promotion of economic development as "a traditional and long accepted function of government." *Kelo*, 545 U.S. at 484. The fact that Pennsylvania law did not recognize that objective as a basis for the exercise of eminent domain power is of no constitutional significance. *Snowden*, 321 U.S. at 11. The actions of the Defendants were rationally related to a

48

legitimate state interest.[14]  The Due Process Clause requires nothing more.  *Braun*, 519 F.3d at 574.

Count IV of the second amended complaint fails to allege a violation of the Fourteenth Amendment.  (Docket No. 126, ¶¶ 171-178).  Therefore, the Defendants' motion to dismiss must be granted with respect to the Plaintiffs' substantive due process claims.[15]

## E.   The Conspiracy Claims

In Count V of the second amended complaint, the Plaintiffs assert federal conspiracy claims under § 1983.[16]  (Docket No. 126, ¶¶ 179-184).  Nevertheless, the Court has already concluded that

---

[14]The Plaintiffs aver that the conduct of the Defendants was not necessary to secure a compelling governmental interest.  (Docket No. 126, ¶ 177).  This averment mirrors the standard of strict scrutiny, which is used to evaluate the constitutional validity of legislative enactments that infringe fundamental rights or classify individuals on the basis of inherently suspect criteria.  *Craigmiles v. Giles*, 312 F.3d 220, 223 (6th Cir. 2002).  The Plaintiffs believe that the takings at issue in this case were violative of their "fundamental" property rights.  (Docket No. 126, ¶ 174).  Nevertheless, the Takings Clause does not categorically prohibit the taking of private property for a public use, "but instead places a condition on the exercise of that power."  *First Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 314 (1987).  The second amended complaint alleges no violation of a fundamental right enjoyed by the Plaintiffs.  Consequently, the strict scrutiny standard has no application in this case.  Admittedly, challenges to the actions of individual state officials are evaluated differently under the Due Process Clause than are challenges to the validity of legislative enactments.  *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).  In either case, however, the dispositive question is whether the challenged governmental action is "fatally arbitrary."  *Id.*  Because the actions taken by the Defendants in this case were rationally related to a legitimate governmental interest, they were not "arbitrary" in the constitutional sense.  *Braun v. Ann Arbor Charter Township*, 519 F.3d 564, 574 (6th Cir. 2008).

[15]Because the second amended complaint fails to allege a violation of the United States Constitution, the Court need not consider the Defendants' alternative arguments concerning the defenses of qualified immunity and "good faith."  (Docket No. 162, pp. 32-42).  Furthermore, since it is clear that the allegations contained in the second amended complaint entitle the Plaintiffs to no form of relief, the Court need not specifically consider whether the resolution of the state-court proceedings in favor of the Plaintiffs effectively moots their request for injunctive relief. (Docket No. 163, pp. 26-27).

[16]Count V of the second amended complaint does not expressly reference 42 U.S.C. § 1983.  The fact that the Plaintiffs base their conspiracy claims on § 1983 can be inferred from their arguments in support of those claims.  (Docket No. 163, pp. 20-22).  The Defendants apparently construed Count V to assert claims under 42 U.S.C. § 1985(3).  (Docket No. 162, pp. 31-32).  Although § 1985(3) does not appear to be the basis for the Plaintiffs' conspiracy claims in this case, it is worth noting that the allegations contained in the second amended complaint could not support a cause of action under that statute, since the Plaintiffs do not allege that the Defendants' actions were motivated by a class-based animus.  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268-269 (1993); *United Brotherhood of Carpenters & Joiners of America v. Scott*, 463 U.S. 825, 829 (1983); *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

49

the second amended complaint alleges no violation of the United States Constitution.  A plaintiff cannot advance a conspiracy claim under § 1983 without alleging an underlying violation of a federally protected right.  *Hadley v. Gutierrez*, 526 F.3d 1324, 1332 (11th Cir. 2008); *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995).  Because the second amended complaint alleges no actionable violation of federal law, the Plaintiffs' federal conspiracy claims must be dismissed.

### F.      The State Constitutional Claims

In Counts VI, VII, VIII and IX of the second amended complaint, the Plaintiffs assert claims under the Pennsylvania Constitution which mirror their claims under the United States Constitution. (Docket No. 126, ¶¶ 185-205).  These claims raise novel and complex issues of Pennsylvania law. 28 U.S.C. § 1367(c)(1).  Moreover, the Court has already concluded that the Plaintiffs' federal constitutional claims must be dismissed.  28 U.S.C. § 1367(c)(3).  Under these circumstances, it is appropriate for the Court to decline to exercise supplemental jurisdiction over the Plaintiffs' state constitutional claims.  *Combs v. Homer-Center School District*, 540 F.3d 231, 253-254 (3d Cir. 2008).  If the Plaintiffs believe that they have valid claims under the Pennsylvania Constitution, they are free to pursue them in a Pennsylvania court.  Because the Plaintiffs' state constitutional claims have been pending in this Court until today, any limitations periods applicable to those claims have been tolled as a matter of federal law.  28 U.S.C. § 1367(d); *Jinks v. Richland County*, 538 U.S. 456, 461-465 (2003).  Federal law establishes a 30-day safe harbor within which the Plaintiffs will be able to refile their state constitutional claims in a Pennsylvania court without regard to whether such claims would otherwise be time-barred under Pennsylvania law.  *Hedges v. Musco*, 204 F.3d 109, 122-124 (3d Cir. 2000).  Consequently, this Court need not entertain those claims, which would be more appropriately adjudicated by a Pennsylvania court.

50

### G.    Futility of Amendment

Unlike most cases dismissed at the pleading stage, this case is being dismissed in the wake of an exhaustive record developed during parallel proceedings in the Pennsylvania courts. The factual circumstances of the challenged takings are generally not in dispute, and the issues of contention between the parties are essentially legal in nature. Having considered both the arguments advanced by the parties and the record developed during the state-court proceedings, the Court is convinced that the Plaintiffs cannot establish a violation of the United States Constitution, and that it would be futile to permit the filing of an amended complaint. Therefore, Counts I, II, III, IV and V of the second amended complaint will be dismissed with prejudice. (Docket No. 126, ¶¶ 147-184). The Plaintiffs will not be granted leave to amend their complaint. *McGreevy v. Stroup*, 413 F.3d 359, 371 (3d Cir. 2005). Counts VI, VII, VIII and IX will be dismissed without prejudice. (Docket No. 126, ¶¶ 185-205). The Plaintiffs remain free to pursue their state constitutional claims in a Pennsylvania court.

### V.    Conclusion

Both the record of the state-court proceedings and the allegations contained in the second amended complaint reveal that the Defendants sought to take the Plaintiffs' property in order to facilitate the construction of an industrial park. The Commonwealth Court determined that, under the circumstances of this case, Pennsylvania law did not permit the taking of the Plaintiffs' property for this purpose. *In Re: Condemnation by the RALC*, 962 A.2d at 1265. It does not follow, however, that the takings at issue were in violation of the United States Constitution. The Constitution is not "a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Paul*, 424 U.S. at 701. "Our Constitution deals with the large concerns of the governors

and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Daniels*, 474 U.S. at 332.  The words "public use" contained in the Fifth Amendment are broad enough to encompass the promotion of economic growth that would result from the creation of an industrial park.  *Kelo*, 545 U.S. at 484.  The extent to which the Pennsylvania Legislature has chosen to limit the State's power of eminent domain beyond the limits already imposed by the Fifth and Fourteenth Amendments is not a matter of federal concern.

Had the Defendants succeeded in their efforts to appropriate the Plaintiffs' property, "just compensation" for the property would have been provided.  26 PA. CONS. STAT. § 303.  Pennsylvania law affords the Plaintiffs the right to recover the costs and expenses that they incurred because of the condemnation proceedings initiated by the Defendants.  26 PA. CONS. STAT. § 306(g)(1).  The United States Constitution requires no more.  The motion to dismiss filed by the Defendants (Docket No. 161) will be granted with respect to the federal constitutional claims contained in the second amended complaint, and supplemental jurisdiction over the state constitutional claims will be declined.  An appropriate order follows.

                                                                            BY THE COURT:


                                                                            */s Nora Barry Fischer*
                                                                            Nora Barry Fischer
                                                                            United States District Court Judge


Date:   December 7, 2009
cc/ecf:  All counsel of record